**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DAWN R. VALLIER, | ) | CASE NO. 3:13-CV-00651 |
| | ) | |
| Plaintiff, | ) | JUDGE ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | | |

Plaintiff, Dawn R. Vallier ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On September 14, 2005, Plaintiff filed an application for SSI, alleging a disability

onset date of June 13, 2005.  (Tr. 18.)  Plaintiff's application was denied at all levels of

administrative review.  (Tr. 18-27, 40-46.)  Plaintiff thereafter filed a civil action

appealing the Commissioner's final decision.  (Case No. 3:10-cv-01201.)  On March 30,

2011, the court entered an order granting the parties' Joint Motion to Remand.[1]  (Tr. 1306-1307.)  On remand, the administrative law judge ("ALJ") consolidated Plaintiff's claim with her later claim filed on April 20, 2010. (Tr. 1261.)  The ALJ conducted a supplemental hearing on November 29, 2011.  (*Id.*)  Plaintiff appeared, was represented by an attorney, and testified.  (*Id.*)  A vocational expert ("VE") also testified.  (*Id.*)  On March 28, 2012, the ALJ found that Plaintiff was not disabled.  (Tr. 1258.)  On January 22, 2013, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision.  (Tr. 1245-1247.)

On March 25, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. No. 23, 28, 29.)

Plaintiff asserts the following assignments of error: (1) Defendant failed to provide a complete transcript of the record on remand; (2) the ALJ did not properly

---

[1]  In the parties' Joint Motion for Remand, they agreed that on remand, the ALJ would:

[R]e-evaluate the medical source opinions, including but not limited to those opinions regarding Plaintiff's mental functioning, and formulate a new residual functional capacity (RFC) finding.  The ALJ will also update the record and re-contact treating sources, if necessary, for further clarification/further evidence.  Also, if the new development indicates the presence of non-exertional limitations, the ALJ will elicit vocational expert (VE) testimony regarding the effect of any non-exertional limitations.  In addition, the ALJ should re-evaluate the evidence with respect to Plaintiff's environmental restrictions, and make specific findings in his RFC assessment accounting for any limitations resulting from her pacemaker implantation and asthma triggers.  At step five, the ALJ should elicit VE testimony to determine if jobs exist in significant numbers which a person with Plaintiff's RFC and vocational profile could perform.

(Tr. 1306-1307.)

account for Plaintiff's pacemaker precautions; (3) the ALJ did not properly evaluate Plaintiff's intellectual ability; (4) the ALJ did not properly evaluate the medical opinions of record.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in June 1979 and was 26-years-old on the date she filed her application.  (Tr. 1273.)  She had a limited education and was able to communicate in English.  (*Id.*)  She had past relevant work as a housekeeper and a fast food worker. (Tr. 1272.)

### B.    Medical Evidence

#### 1.    Physical Limitations

##### a.    Medical Reports

Plaintiff has a history of bronchial asthma since childhood and a history of pseudoseizures beginning in September 2002.  (Tr. 168, 1659.)  Testing in March 2003 showed no physiologic or anatomic basis for Plaintiff's seizures.  (Tr. 245.)  At that time, Plaintiff was pregnant and diagnosed with stress-induced pseudoseizures, borderline personality, and malingering.  (Tr. 243-244.)

In August 2004, Imran Ami, M.D., a neurologist, stated that Plaintiff's partial onset seizures were better controlled with optimization of Dilantin therapy.  (Tr. 459.)  In November 2004, Plaintiff was treated at St. Vincent Mercy Medical Center ("St. Vincent's"), where she was diagnosed with seizure disorder and medication noncompliance.  (Tr. 343.)

3

In February 2005, Plaintiff was admitted to the hospital for long term video monitoring for seizures.  (Tr. 453.)  At that time, Plaintiff reported that her seizure frequency had increased from one per month to one seizure every week.  (*Id.*)  Electroencephalographic (EEG) monitoring showed non-epileptiform seizures.  (*Id.*)

Plaintiff was admitted to St. Vincent's in June 2005 for loss of consciousness with syncopal episode and lack of responsiveness.  (Tr. 1736.)  It was noted that Plaintiff had a history of polydrug use and loss of consciousness.  (*Id.*)  While hospitalized, Plaintiff was diagnosed with severe vasovagal syndrome.  (*Id.*)  As a result, Mark F. O'Connor, M.D., inserted a permanent dual chamber pacemaker in Plaintiff.  (*Id.*)

At a follow-up appointment with Dr. O'Connor in July 2005, Dr. O'Connor reported that Plaintiff was doing "very well with good suppression of vasovagal syndrome."  (Tr. 492.)  He advised Plaintiff to restrict her arm movements and any heavy activities for the next month.  (*Id.*)

In September 2005, Plaintiff was admitted to St. Vincent's following a possible seizure, at which time Plaintiff's family stated that Plaintiff had been smoking crack.  (Tr. 273.)  Plaintiff denied smoking crack.  (*Id.*)  She was diagnosed with cocaine abuse, amphetamine abuse, marijuana abuse, and medical noncompliance.  (Tr. 293.)  A computed tomography (CT) scan of Plaintiff's brain from September 2005 indicated normal findings.  (Tr. 589.)

In October 2005, Plaintiff presented to St. Anne Mercy Hospital with complaints of chest pain and seizure.  (Tr. 512.)  Plaintiff stated that she last smoked marijuana

4

two to three weeks earlier, "depending on whom she is talking to." (Tr. 513.) In an emergency department report from October 24, 2005, David Brancati, D.O., made the following remarks regarding Plaintiff:

> She is a very peculiar patient, we have seen her here in the emergency department before. Very difficult to pin down. She states to me that she is on Social Security Disability for chronic seizures, although as I speak with her further, it appears to me that she does not have seizures. Her initial chief complaint on the chart was chest pain. For me, she complained of no chest pain, she was complaining of left arm numbness which she states is the typical prodrome to seizures for her.

(Tr. 515.) Dr. Brancati diagnosed questionable chest pain, left arm numbness, suspect pseudoseizure, and noncompliance. (Tr. 516.) Dr. Brancati remarked: "I was unclear as to why she was on disability for pseudoseizures and also not taking her medications. She was also very noncompliant here in the emergency department and not cooperative, very difficult to question, delayed, slow answer, and poorly inappropriate with myself and the staff." (*Id.*) Dr. Brancati reported that Plaintiff might benefit from psychiatric consultation. (*Id.*)

In November 2005, Kettlie Daniels, M.D., reported that "I doubt that [Plaintiff] has schizophrenia or bipolar disorder. She does have some significant character traits." (Tr. 753.) Dr. Daniels encouraged Plaintiff to consider studying for her GED and finding some kind of direction or goals for her life. (*Id.*)

Plaintiff presented to the Toledo Hospital emergency room in March 2006 with a seizure episode. (Tr. 739.) The emergency center report indicated that the previous night, Plaintiff was out celebrating with her cousin and drinking alcohol. (*Id.*) Plaintiff had been at the emergency room earlier and was escorted out by security, at which

time her friend took her home.  (Tr. 739.)  Plaintiff then went home and drank more alcohol, until she began having a generalized tonoclonic seizure and returned to the hospital via an ambulance.  (*Id.*)  It was noted that Plaintiff had been noncompliant with her medications.  (Tr. 740.)

Plaintiff was admitted to St. Vincent's in May 2006 for seizure and headache. (Tr. 1693.)  She was diagnosed with epilepsy (noncompliant), encephalopathy (postictal versus metabolic from polysubstance abuse), and polysubstance abuse.  (Tr. 862.)

Plaintiff presented to St. Vincent's in March 2007 with complaints of right knee pain.  (Tr. 1661.)  X-rays taken at that time indicated normal findings.  (*Id.*)

Plaintiff presented to St. Charles Mercy Hospital in July 2007 after she was involved in a car crash.  (Tr. 991.)  Plaintiff reported that she hit her stomach on the steering will and complained of abdominal pain and neck pain.  (*Id.*)  Plaintiff was diagnosed with abdominal pain and cervical strain.  (Tr. 992.)

Plaintiff presented to St. Vincent's in February 2008 with complaints of left knee pain.  (Tr. 1633.)  An examination of Plaintiff's knee was normal except for pain at the distal patella.  (Tr. 1635.)  Plaintiff was diagnosed with knee pain and prescribed Ultram.  (*Id.*)  Approximately ten days later, Plaintiff presented to St. Vincent's again with complaints of right knee pain.  (Tr. 1631.)  She was diagnosed with patellar tendinitis and given a prescription for Darvocet and a patella brace.  (*Id.*)

Plaintiff was treated at the Toledo Hospital in July 2008 for an injury to her right hand after getting into a fight with someone at a graduation party, punching the person in the face and then punching her car.  (Tr. 2189.)  A physical examination revealed

6

swelling over the dorsum of the hand and pain with any movement of the digits.  (*Id.*)
She was diagnosed with a hand contusion.  (*Id.*)

In August 2008, Dr. O'Connor reported that Plaintiff was "doing very well with good suppression of vasovagal syndrome."  (Tr. 1168.)  In September 2008, Dr. O'Connor again reported that Plaintiff was doing "very well."  (Tr. 1178.)

Plaintiff was treated at the Toledo Hospital in November 2008 after a fall.  (Tr. 2177.)  She was diagnosed with a left foot/ankle sprain.  (Tr. 2182.)

A chest x-ray taken at St. Vincent's in January 2009 for Plaintiff's complaints of dyspnea showed no acute abnormality.  (Tr. 1607.)

In February 2009, Dr. O'Connor reported that Plaintiff was "doing very well with normally functioning dual-chamber pacemaker . . . which is definitely helping to suppress vasovagal spells in conjunction with her ProAmatine, Toprol and medical regimen." (Tr. 1869.)

In February 2009, Dr. O'Connor completed a welfare form on Plaintiff's behalf. (Tr. 2138.)  Dr. O'Connor noted on the form that he had not evaluated Plaintiff's standing/walking and lifting/carrying abilities and that she had no pushing/pulling, bending, reaching, handling, repetitive foot movement, seeing, hearing, or speaking limitations.  (Tr. 2139.)  He then concluded that Plaintiff was unemployable and unable to work.  (*Id.*)

Plaintiff was treated at the Toledo Hospital in April 2009 for bronchitis.  (Tr. 2152.)  A chest x-ray taken at that time for Plaintiff's chest pain was normal.  (Tr. 2160.)

In August 2009, Plaintiff saw Dr. O'Connor for a follow-up.  (Tr. 1858.)  She had some lightheaded spells and dizziness, but no syncope or falling and no injuries of any

kind.  (*Id.*)  She had no problems with chest pains, palpitation, or shortness of breath.

(*Id.*)  She had no problems with her pacemaker site.  (*Id.*)  Dr. O'Connor reported that

Plaintiff was "doing well at this point with normally functioning pacemaker and

vasovagal syndrome.  At this point, she is experiencing some lightheadedness off her

medications, so we urged her to get back on those medications."  (Tr. 1859.)

Plaintiff was treated at St. Vincent's in August 2010 for complaints of shortness

of breath and chest pain.  (Tr. 2076.)  A CT scan showed no evidence of a pulmonary

embolism.  (Tr. 2108.)

Treatment notes from Dr. O'Connor dated June 2011 and October 2011

continued to reflect that Plaintiff was "doing well at this point with good suppression of

vasovagal syndrome with dual-chamber pac[emaker]. . . ."  (Tr. 2246, 2248.)

In October 2011, Dr. O'Connor signed a Cardiac Residual Functional Capacity

Questionnaire on behalf of Plaintiff.  (Tr. 2338.)  In response to questions relating to

Plaintiff's impairments, Dr. O'Connor repeatedly wrote "see progress notes."  (Tr. 2338-

2339.)  When asked his opinion on the role stress had in bringing on Plaintiff's

symptoms, Dr. O'Connor wrote "unable to evaluate."  (Tr. 2339.)  He also wrote "unable

to evaluate" when asked to set forth Plaintiff's work-related functional limitations.  (Tr.

2340-2343.)

In December 2011, primary care physician Kanchan Landge, M.D., completed a

residual functional capacity assessment on Plaintiff's behalf.  (Tr. 2523.)  Dr. Landge

opined that, during an eight-hour workday, Plaintiff could sit for four hours at one time,

stand for two hours at one time, and walk for two hours at one time.  (Tr. 2524.)  Dr.

Landge further opined that Plaintiff could sit for four hours total, stand for four hours

total, and walk for four hours total.  (*Id.*)  According to Dr. Landge, Plaintiff could occasionally lift/carry up to five pounds; could occasionally bend and climb, but could frequently perform all other postural maneuvers; had a mild limitation regarding exposure to marked changes in temperature and humidity; and had a moderate limitation regarding working around unprotected heights, moving machinery, driving automotive equipment, and exposure to dust, fumes, and gases.  (Tr. 2526.)

In December 2011, Dr. Sunita Banerjee of Mercy St. Vincent Medical Center Family Practice referred Plaintiff for a physical work performance evaluation.  (Tr. 2528.)  The results of the evaluation demonstrated that Plaintiff is capable of performing physical work at the light level of exertion.  (*Id.*)  The evaluator commented that "[b]ased on this evaluation, it is difficult to predict whether the claimant is capable of sustaining the light level of work for an 8-hour day."  (*Id.*)

### b.    Agency Reports

In June 2010, state agency consultant Anton Freihofner, M.D., opined that Plaintiff had the physical residual functional capacity to perform light work limited to never climbing ladders, ropes, or scaffolds; avoiding concentrated exposure to odors, dusts, gases, poor ventilation, etc.; and avoiding all exposure to hazards such as machinery and heights.  (Tr. 1283-1285.)

### 2.    Mental Limitations

### a.    Medical Reports

A progress note from October 2002 states that "[p]atient does not want to work anymore and would like to have SSI."  (Tr. 646.)

9

In August 2008, Plaintiff was referred for a mental health assessment.  (Tr. 1819.)  She reported that she had received mental health services about four years earlier.  (*Id.*)  She further indicated that she had two sons who were removed from her care in 2000 after one of them was badly hurt.  (*Id.*)  Plaintiff reported that she last worked in 2004 as a waitress and was fired for running a credit card scam on her patrons.  (*Id.*)  Plaintiff stated that she did not want to work.  (*Id.*)  She was diagnosed with bipolar I disorder, post-traumatic stress disorder, schizoaffective disorder, alcohol and cannabis dependency with physiological dependence, cocaine dependency with physiological dependence (in full sustained remission), and borderline personality disorder.  (Tr. 1831.)  Plaintiff was advised to keep her next appointment, abstain from alcohol and illegal drugs, and learn new ways to appropriately express her anger and manage her mood swings.  (*Id.*)

In October 2008, Plaintiff had an initial psychiatric evaluation with Tufal Kahn, M.D.  (Tr. 1803.)  Plaintiff reported that one of her main reasons for seeing Dr. Kahn, in addition to her mood instability, was her disability application.  (Tr. 1804.)  Dr. Kahn noted, "[t]his is why she wanted to come here at this point and did not seek treatment before."  (*Id.*)  Dr. Kahn diagnosed depressive disorder, not otherwise specified (NOS), post-traumatic stress disorder, intermittent explosive disorder, and polysubstance dependence.  (Tr. 1805.)  Dr. Kahn prescribed medication and recommended counseling.  (Tr. 1806.)  He also offered a referral to substance abuse treatment, but Plaintiff declined, stating that she had been sober for about one month.  (*Id.*)

In August 2011, Plaintiff reported to Dr. Khan that she was doing well, and she

10

denied any recent mood instability, anxiety, or depression.  (Tr. 2512.)  Her thought

process was linear and goal-directed, and her thought content was negative for

thoughts of self-harm, harm to others, or any psychotic symptoms.  (*Id.*)

In November 2011, Dr. Kahn completed a mental questionnaire on Plaintiff's

behalf.  (Tr. 2500.)  Dr. Kahn reported that Plaintiff missed appointments in June, July,

August, October, and November 2011.  (*Id.*)  He noted Plaintiff's symptoms as

depression and anxiety.  (*Id.*)  Dr. Kahn diagnosed depressive disorder NOS, post-

traumatic stress disorder, intermittent explosive disorder, and polysubstance abuse in

complete remission.  (Tr. 2501.)  Dr. Kahn also completed a mental residual functional

capacity assessment.  (Tr. 2503-2505.)  He opined that Plaintiff was moderately limited

in several work-related areas, and markedly limited with regard to the following: her

ability to maintain attention and concentration for extended periods; and her ability to

perform activities within a schedule, maintain regular attendance, and be punctual

within customary tolerances.  (Tr. 2504.)

### b.    Agency Reports

In December 2005, state agency psychologist Karen Stailey opined that Plaintiff

had the mental residual functional capacity to understand, remember, and carry out one

and two step instructions; Plaintiff's concentration, persistence, and pace were

adequate for simple, repetitive tasks; her social functioning was adequate for interaction

with the public but due to a reported history of difficulty with authority figures, she

should have brief superficial interactions with supervisors; and Plaintiff would do best in

a work setting with one and two step repetitive tasks with regular expectations and a

11

few changes.  (Tr. 527.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Plaintiff did not have a driver's license.  (Tr. 2575.)  She had a ninth grade education and had not obtained her GED.  (*Id.*)  She could read and write a grocery list but could not spell very well.  (Tr. 2576.)  She last worked eight years prior to the hearing, at which time she was employed as a waitress. (Tr. 2577.)

Plaintiff testified that she cannot work because of her COPD, dizziness, seizures, and pacemaker.  (Tr. 2578.)  She also stated that she cannot work because she is bipolar and depressed, and she has issues getting along with other people.  (Tr. 2579.)  She also testified that she has problems with her legs and knees.  (Tr. 2579.)  "They hurt.  And sometimes I can't sit too long or I can't stand too long before I have to sit or stand, because my legs start to hurt really bad."  (*Id.*)  Plaintiff stated that she has been getting bad headaches just about everyday for the last ten years.  (Tr. 2585.)

Plaintiff slept at least three or four hours a night.  (Tr. 2587.)  She spent most of her days lying down.  (Tr. 2588.)  To alleviate her pain and discomfort, Plaintiff used a heating pad. (*Id.*)  She did not do any household chores, but occasionally cooked meals.  (Tr. 2591.)  She sometimes watched TV, and she used Facebook and played games on the computer.  (*Id.*)  Plaintiff was able to attend to her personal needs like showering, dressing, and feeding herself.  (Tr. 2592.)  She did not drive, belong to clubs, or have hobbies.  (Tr. 2596.)  She sometimes visited friends and neighbors.  (*Id.*)

12

Plaintiff could walk about a half a block before getting dizzy or tired.  (Tr. 2592.) She could stand for 10-15 minutes before having to sit.  (*Id.*)  "I get real lightheaded and clammy and I feel like I'm wore out already."  (*Id.*)  She could sit for about 10-15 minutes before her legs begin to hurt and she gets "dizzy and clammy."  (Tr. 2592-2593.)  Plaintiff could lift about 15 pounds.  (Tr. 2593.)  She could bend and touch her toes, but it would make her lightheaded.  (*Id.*)  She could bend and touch her knees. (*Id.*)  Due to her pacemaker, Plaintiff was not supposed to be in front of a microwave, use a cell phone, or "be around a lot of metal machinery."  (Tr. 2595.)

Plaintiff had a history of substance abuse.  (Tr. 2589.)  She last used marijuana two years ago, cocaine four years ago, and alcohol one year ago.  (*Id.*)

## 2.  VE Testimony

A vocational expert testified at Plaintiff's hearing.  The VE testified that Plaintiff had past work as a housekeeper (light, unskilled) and a fast food worker (light, unskilled).  (Tr. 2605.)

The ALJ asked the VE to assume a hypothetical individual vocationally situated at Plaintiff.  (Tr. 2604.)  The hypothetical individual could perform all of the functions of light work except she could only occasionally climb stairs, she could not climb ladders, she could never balance on one leg at a time, she could rarely[2] stoop, and she could occasionally crouch and crawl.  (Tr. 2606.)  The individual could have occasional exposure to temperature extremes and humidity and concentrated respiratory irritants, and she could not have any exposure to obvious hazards.  (*Id.*)  The hypothetical

---

[2]  The ALJ defined "rarely" as "less than occasionally but not completely precluded."  (Tr. 2606.)

13

individual could work at a specific vocational preparation (SVP) level of 1 to 2,[3] where the pace of productivity is not dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt.  (*Id.*)  Furthermore, the individual could perform work where reading, writing, and math are not important, and contact with the general public is rare and contact with co-workers is occasional.  (*Id.*) The VE testified that an individual with the aforementioned limitations could not perform Plaintiff's past relevant work.  (*Id.*)  The VE testified that there were jobs existing both in the state of Ohio and in the national economy that the hypothetical individual could perform at the light level, such as an inspector and hand packager, an injection molding machine tender, and a postage machine operator.  (Tr. 2607.)  The VE further testified that the representative jobs named could be performed with a sit/stand option at will. (Tr. 2608.)  When asked to further assume that the individual would need to avoid electromagnetic sources and other things due to having a pacemaker, the VE testified that the inspector and hand packager jobs would remain.  (Tr. 2609.)

The VE explained that tolerance for absenteeism varies, but that an individual who missed even one to two days a month on a regular basis would compromise her ability to remain employed.  (*Id.*)  The VE also testified that an employee must be able to be on task for at least 90 percent of the workday.  (*Id.*)

### III.    STANDARD FOR DISABILITY

---

[3]     SVP ratings indicate how long it takes a worker to learn how to do his or her job at an average performance level.  A rating of SVP 1 means a short demonstration is the amount of training required to learn the job, and a rating of SVP 2 means up to one month of training is required to learn the job.

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

15

past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since September 14, 2005, the application date.

2. The claimant has the following severe impairments: pseudoseizures; migraine headaches; chronic obstructive pulmonary disease ("COPD"); status post pacemaker surgery; vasovagal syndrome; polysubstance abuse; hypertension; anxiety; and depression.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: work that can be done in a seated or standing position; occasional crouching, crawling, and climbing ramps or stairs; never climb ladders, ropes, or scaffolds; no balancing on one leg at a time; rare, defined as less than occasionally but not completely precluded, stooping greater than 90 degrees; occasional exposure to temperature extremes, humidity, and concentrated respiratory irritants; no exposure to obvious hazards; work with an SVP of 1 to 2 where the pace of productivity is not dictated by an external source over which the claimant has no control, such as an assembly line or conveyer belt; work where reading, writing, and math are not important; rare contact with the general public; and occasional contact with co-workers.

5. The claimant is unable to perform any past relevant work.

6. The claimant was born in June 1979 and was 26-years-old, which is defined as a younger individual age 18-49, on the date the application

16

was filed.

7.  The claimant has a limited education and is able to communicate in English.

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since September 14, 2005, the date the application was filed.

(Tr. 1263-1274.)

**LAW & ANALYSIS**

**A.   Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that

17

the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

> **B.**  **Plaintiff's Assignments of Error**
>
> > **1.  Defendant Failed to Provide a Complete Transcript of the Record on Remand.**

Plaintiff asserts that certain portions of the administrative record were missing from the transcript filed by the Commissioner on June 20, 2013.  (Doc. No. 13.) Specifically, Plaintiff asserts that the administrative record should, but did not, include testimony from the vocational expert who testified at Plaintiff's hearing on November 29, 2011.

On November 14, 2013, the Commissioner moved for and was granted an extension of time to file her Brief on the Merits.  (Doc. No. 21.)  In her motion, the Commissioner indicated that the record was incomplete, and that the Appeals Council was in the process of transcribing the missing portions of the record.  (*Id.*)  On November 21, 2013, Defendant filed a Supplemental Transcript of Proceedings before the Social Security Administration.  (Doc. No. 27, Tr. 2567-2618.)  The supplemental transcript included the missing VE testimony.  (Tr. 2567-2618.)  Consequently, Plaintiff's first assignment of error is moot in light of the fact that the Commissioner filed

18

a supplemental transcript that contained the missing vocational expert testimony from Plaintiff's November 2011 hearing.

### 2.  The ALJ Did Not Properly Account for Plaintiff's Pacemaker.

Plaintiff argues that the ALJ did not account for Plaintiff's pacemaker when formulating her residual functional capacity (RFC).  For the following reasons, Plaintiff's argument is not well taken.

RFC is an indication of a claimant's work-related abilities despite his limitations. *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], when the claimant is proving the extent of his impairments.")

Here, Plaintiff argues that the ALJ erred by failing to consider the impact her pacemaker has on her RFC.  Plaintiff contends in her Brief that the ALJ's decision includes "not one mention of the fact that claimant has a pacemaker."  (Plaintiff's Brief

19

("Pl.'s Br.") at 27.)  This is incorrect.  In formulating Plaintiff's RFC, the ALJ engages in a detailed discussion of Plaintiff's medical history, and directly acknowledges that "the claimant had a permanent pace maker placed by Mark O'Connor, M.D., in July 2005." (Tr. 1268.)  Thus, there is no question that Plaintiff has had a pacemaker since 2005: Plaintiff has presented evidence of this limitation and the ALJ explicitly acknowledges it in her decision.  Plaintiff does not, however, explain how evidence of her pacemaker supports a more restrictive RFC than the one found by the ALJ.  It is well established that the "mere diagnosis" of a condition "says nothing" about its severity or its effect on a claimant's ability to perform work.  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Therefore, the fact that a physician installed a permanent pacemaker in Plaintiff did not, alone, require the ALJ to include limitations specifically related to the pacemaker in Plaintiff's RFC.

Plaintiff argues in her brief that the ALJ "*did not address the 'precautions' that counsel argued in the first instance to the Appeals Council, and for which counsel provided documentation indicating those precautions* (Tr. 1248-1253.)"  (Pl.'s Br. 27) (emphasis in original).  A review of the letter Plaintiff's counsel sent to the Appeals Council, however, shows that counsel did not in fact include any documentation of precautions related to Plaintiff's pacemaker.  (Tr. 1248-1253.)  While Plaintiff's counsel argued in the letter that Plaintiff "still has strong limitations with regard to electromagnetic fields," counsel did not indicate which medical evidence in Plaintiff's record supports this claim.  (Tr. 1252.)  Thus, Plaintiff argues that she needs to avoid electromagnetic sources due to concerns for her pacemaker, but offers no medical

20

evidence in support of her assertion.[4]  This Court, like the ALJ, is not in a position to

decide whether electromagnetic fields would pose a substantial risk of altering

pacemaker settings.  Without citation to medical evidence or medical expert testimony

supporting Plaintiff's claim that she must avoid exposure to electromagnetic fields, there

is insufficient evidence supporting a conclusion that the ALJ erred by failing to include

such a limitation in Plaintiff's RFC.[5]

     Furthermore, Plaintiff contends that the ALJ erred because she failed to comply

with the court's remand order.  It is true that the "Order of Appeals Council Remanding

---

[4]    In fact, the evidence available does not seem to support Plaintiff's conclusion that Plaintiff's pacemaker necessitates additional restrictions beyond those included in the ALJ's RFC determination.  As the Commissioner points out, Dr. O'Connor – the treating cardiologist who inserted Plaintiff's pacemaker – rendered an RFC opinion in 2011 and did not note any environmental restrictions related to Plaintiff's pacemaker. (Tr. 2340-2343.)

[5]    Plaintiff also argues that the ALJ erred by ignoring the VE's testimony that if Plaintiff had to avoid any work around machinery, the number of jobs available to her would be reduced significantly. (Tr. 2608-2609.)  As discussed above, however, Plaintiff has failed to offer any medical evidence to support her argument that Plaintiff would need to avoid electromagnetic sources due to her pacemaker.  Thus, while the VE was qualified to opine which jobs would be available to a person with Plaintiff's limitations who could not work around any kind of machinery, this does not necessarily mean that the VE had the expertise to conclude that a person with a pacemaker would need to avoid electromagnetic sources.  Accordingly, the ALJ did not err by failing to address the VE's testimony regarding the elimination of certain jobs due to a pacemaker when making her step five finding. (Tr. 1273.)  Without any medical evidence or medical expert testimony regarding the effects of the environment on pacemaker settings, the VE's opinion on the matter has no impact on the outcome of Plaintiff's case.  Moreover, even if Plaintiff's pacemaker prevents her from working around machinery, the VE identified two jobs – inspector and hand packager – that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 1273, 2609.) Accordingly, any error would be harmless.

21

Case to Administrative Law Judge" states the following with regard to the court's remand order: "[T]he Court notes that further evaluation of the environmental aspects of the claimant's residual functional capacity may be warranted given her pacemaker implantation and asthma triggers."  (Tr. 1320.)  Despite instruction from the court, the ALJ did not engage in a discussion of the effects of the environment on Plaintiff's pacemaker.  Nonetheless, the ALJ's failure to comply with the court's remand order is harmless, as the VE identified two jobs – inspector and hand packager – that exist in significant numbers in the national economy that Plaintiff can perform even if she was required to avoid machinery due to her pacemaker.[6]  (Tr. 1273, 2609.)  Furthermore, the ALJ accommodated Plaintiff's asthma triggers by limiting her to only occasional exposure to temperature extremes, humidity, and concentrated respiratory irritants. (Tr. 1266.)  For the foregoing reasons, Plaintiff's second assignment of error does not present a basis for remand of her case.

### 3.  The ALJ Did Not Properly Evaluate Plaintiff's Intellectual Ability.

Plaintiff argues that the ALJ did not properly account for Plaintiff's mental limitations.  According to Plaintiff, the ALJ erred by failing to find that Plaintiff was illiterate.  Furthermore, Plaintiff contends that she could not perform any of the representative jobs included in the ALJ's step five finding, because the VE testified that the reasoning level required of the jobs was greater than one or two.  For the following reasons, Plaintiff's argument is without merit.

---

[6]    The ALJ noted that there are approximately 2,500 inspector and hand packager jobs in the state and approximately 125,000 nationally.  (Tr. 2607.)

The ALJ determined that Plaintiff had a "limited education." (Tr. 1273.)

> Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. § 416.964. Plaintiff challenges the ALJ's conclusion, arguing that she is essentially illiterate. "Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." *Id.* As the Commissioner correctly argues in her Brief, the record does not support Plaintiff's argument that she is illiterate. She was able to complete many of her own forms in conjunction with filing her application for benefits (Tr. 1488-1495, 1499-1502, 1504-1511, 1517-1524), and a June 2005 hospital record indicates that "[p]atient can read" (Tr. 299). Moreover, Plaintiff had a ninth grade education and admitted at her hearing that she could read and write a grocery list and use Facebook. (Tr. 2575, 2576, 2591.) She also had past work experience as a waitress. (Tr. 2577.) As a result, the record does not support a finding that Plaintiff had little or no formal schooling and could not read or write a simple message. Accordingly, the ALJ did not err in finding that Plaintiff has a limited education.

Furthermore, Plaintiff's argument that she could not perform any of the representative jobs named because the VE testified that the reasoning level required of the jobs was greater than one or two is without merit. At Plaintiff's hearing, the ALJ

23

presented a hypothetical to the VE which included the following limitations, among others: "Work at an SVP of 1 to 2 and the pace of productivity is not dictated by an external source over which the individual has no control such as an assembly line or a conveyor belt.  Reading, writing, and math should not be important."  (Tr. 2606.)  The VE testified that an individual with those restrictions could perform work as an inspector and hand packager, an injection molding machine tender, or a postage machine operator.  (Tr. 2607.)  Plaintiff's counsel later posed the following question to the VE:

> And if I were to say to you that in addition to the limitation that the judge placed on the SVPs of being 1 and 2 – assume for a moment that in terms of – in terms of reasoning level as defined in the DOT, in terms of complexity not just how long it takes to learn typically a job but the complexity – the reasoning level of no more than one or two.  Would these jobs be one or two or would they be more than that?

(Tr. 2612.)  The VE responded that the jobs he presented were typically a reasoning level of three, and thus they would be ruled out if Plaintiff was limited to jobs at a reasoning level of no more than one or two.  (Tr. 2613.)  In determining Plaintiff's RFC, the ALJ limited Plaintiff to work with an SVP of 1 to 2[7] where reading, writing, and math are not important.  (Tr. 1266-1267.)  The ALJ did not include a limitation based on reasoning level in Plaintiff's RFC.

There is no merit to Plaintiff's argument that she could not perform any of the representative jobs included in the ALJ's step five finding.  While the VE stated that, in regard to the reasoning level of the representative jobs, "I think typically they're three,"

---

[7]     SVP ratings indicate how long it takes a worker to learn how to do his or her job at an average performance level.  A rating of SVP 1 means a short demonstration is the amount of training required to learn the job, and a rating of SVP 2 means up to one month of training is required to learn the job.

the Dictionary of Occupational Titles indicates that the VE was mistaken on this point. In fact, all of the jobs named require no more than a reasoning level of two. *See* DICOT 559.687-074 (G.P.O.), 1991 WL 683797 (inspector and hand packager); DICOT 556.685-038 (G.P.O.), 1991 WL 683482 (injection molding machine tender); DICOT 208.685-026 (G.P.O.), 1991 WL 671757 (sealing and canceling machine operator). Furthermore, at least two of the representative jobs (inspector/hand packager and injection molding machine tender) require the lowest math level (1), and the injection molding machine tender position requires the lowest reading/writing level (1). *See* DICOT 559.687-074 (G.P.O.), 1991 WL 683797; DICOT 556.685-038 (G.P.O.), 1991 WL 683482; DICOT 208.685-026 (G.P.O.), 1991 WL 671757.

Moreover, even if the VE was correct in testifying that the representative jobs had a reasoning level of three, Plaintiff has failed to show how this would have any impact on the outcome of her case. First, Plaintiff conflates the SVP level and the reasoning level. They are not the same thing. Further, Plaintiff points to no evidence from the record – besides Plaintiff's own testimony – supporting her claim that she cannot read above a third grade reading level and that she cannot understand math. As the Commissioner correctly notes in her Brief, the Sixth Circuit has observed that "there is no precedent that requires the Commissioner to align DOT 'reasoning levels' with [residual functional capacity] classifications." *Monateri v. Comm'r of Soc. Sec.,* 436 App'x 434, 446 (6th Cir. 2011) (unpublished opinion). While *Monateri* is an unpublished opinion that carries only "persuasive weight,"[8] Plaintiff concedes in her Reply Brief that

---

[8]     Unpublished opinions carry no precedential weight, but often carry "persuasive weight." *United States v. Webber,* 208 F.3d 545, 551, n.3

"the VE is not obligated to align the reasoning levels with claimant's RFC classification." (Plaintiff's Reply ("Pl.'s Reply") 4.)  As a result, this Court is at a loss to understand Plaintiff's reason for raising an assignment of error on this point.  Accordingly, Plaintiff's third assignment of error does not present a basis for remand.

### 4.  The ALJ Did Not Properly Evaluate the Medical Opinions of Record.

Plaintiff argues that the ALJ did not properly evaluate the medical opinions of record.  Specifically, Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinions of Dr. Khan, Dr. Landge, and Dr. O'Connor.  For the following reasons, Plaintiff's arguments are without merit.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants

_____

(6th Cir. 2000), citing *Sheets v. Moore,* 97 F.3d 164, 167 (6th Cir. 1996) (noting that unpublished opinions carry no precedential weight and have no binding effect on anyone other than the parties to the actions).

understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

### a. Dr. Khan

Plaintiff argues that the ALJ erred in her assessment of Dr. Khan's opinion regarding Plaintiff's mental RFC. In November 2011, Dr. Kahn completed a mental RFC assessment. (Tr. 2503-2505.) He opined that Plaintiff was moderately limited in several work-related areas, and markedly limited with regard to her ability to maintain attention and concentration for extended periods, and her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 2504.) In her decision, the ALJ noted that she gave "some weight" to this opinion, "as it is generally consistent with the medical record as a whole." (Tr. 1270.) If this were all the ALJ had said about the evidence, the case would require remand.[9]

In this case, however, the ALJ's opinion, taken as a whole, thoroughly evaluates the evidence and indicates the weight the ALJ gave it. This provides a

---

[9]    There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for rejecting it requires remand. *See Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

sufficient basis for the ALJ's decision to give only "some" weight to Dr. Kahn's opinion,
*see* Nelson v. Comm'r of Soc. Sec., 195 F. App'x 462, 470-71 (6th Cir. 2006), and
affords this Court the opportunity to meaningfully review the ALJ's opinion.  In *Nelson*,
the ALJ failed to discuss the opinions of two of the plaintiff's treating physicians, and the
plaintiff argued that this failure constituted a basis for remand.  The Sixth Circuit
disagreed, concluding that "the ALJ's evaluation of [the plaintiff's] mental impairments
indirectly attacks both the supportability of [the treating physicians'] opinions and the
consistency of those opinions with the rest of the record evidence."  195 F. App'x at
470.  Because the ALJ's discussion of the other evidence "implicitly provided sufficient
reasons for not giving . . . controlling weight" to the treating physicians, the Sixth Circuit
concluded that the ALJ's decision satisfied the purposes of the controlling physician
rule.  *Id*. at 472.

        In this case, the ALJ provided a lengthy discussion of the medical evidence
before evaluating the opinions of Plaintiff's treating physicians and the other medical
opinions contained in Plaintiff's record.  (Tr. 1267-1271.)  The ALJ's discussion of the
medical evidence was not merely a rote recitation of Plaintiff's longitudinal history;
rather, the ALJ analyzed the medical evidence and explained how it supported her
ultimate RFC determination.  (*Id.*)  For example, the ALJ discussed the following
evidence, which implicitly rejects Dr. Kahn's extreme opinion regarding Plaintiff's mental
limitations:

- Dr. Daniels reported in November 2005 that he did not believe Plaintiff had
  schizophrenia or bipolar disorder.  (Tr. 1268.)  Dr. Daniels voiced concerns
  about the symptoms Plaintiff was reporting, "especially in light of the fact that
  she is 26 and seeking SSI and has not been able to get SSI."  (*Id.*)

28

- In October 2008, Dr. Khan assessed a global assessment of functioning ("GAF") score of 50.[10] "The U.S. Court of Appeals for the Sixth Circuit has indicated that a GAF of 50 is consistent with the ability to work (*Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6 th Cir. 2007))." (Tr. 1270.)

- In October 2008, Plaintiff indicated that she was applying for disability and wanted to get back on her medications, but she denied any obsessive compulsive disorders, panic disorders, or generalized anxiety disorder symptoms. (Tr. 1270.)

- Treatment records from August 2008 noted that Plaintiff last worked as a waitress but was fired for running a credit card scam on her patrons. (*Id.*) "It was also noted that the claimant stated 'she does not want to work.'" (*Id.*)

- Plaintiff noted improvement in her mood in November 2008 and July 2009. (*Id.*)

- In September 2009, Plaintiff reported that she was compliant with her medications and had no depression or anxiety. (*Id.*)

- "The record documents that the claimant has had no episodes of decompensation with loss of adaptive functioning requiring increased treatment or placement in a less stressful situation. The claimant is able to function independently, and there is no evidence to show that the claimant would not be able to handle even a minimal increase in mental demands or change in the environment." (Tr. 1266.)

Had the ALJ discussed the aforementioned evidence immediately after stating that she was giving "some weight" to Dr. Kahn's opinion, there would be no question that the ALJ provided "good reasons" for giving Dr. Khan's opinion less than controlling weight. The fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when assessing Dr. Kahn's opinion does not necessitate remand of Plaintiff's case. "No principle of administrative law or common

---

[10]    The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

29

sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)).

The medical evidence, as analyzed by the ALJ in her opinion, indicates that Plaintiff was not as limited as Dr. Kahn's 2011 opinion suggested.  Nonetheless, the ALJ acknowledged that Dr. Kahn's opinion was "generally consistent" with the medical record as a whole, and therefore she did not discount the opinion altogether.  (Tr. 1270.)  The ALJ's RFC determination reflects the deference given to Dr. Kahn's opinion, as the ALJ limited Plaintiff to work with an SVP of 1 to 2 where the pace of productivity is not dictated by an external source over which Plaintiff has no control, and work that requires only rare contact with the general public and occasional contact with co-workers.  (Tr. 1267.)   For the foregoing reasons, Plaintiff's argument as to Dr. Khan does not present a basis for remand.

### b.  Dr. Landge

Plaintiff also takes issue with the ALJ's assessment of Dr. Landge's opinion. In December 2011, Dr. Landge completed an RFC assessment on Plaintiff's behalf.  (Tr. 2523.)  Dr. Landge opined that Plaintiff could sit for four hours in an eight-hour day, stand or walk for four hours in an eight-hour day, occasionally lift or carry up to five

pounds, occasionally bend or climb, frequently squat, crawl, or reach, and was moderately restricted from unprotected heights, moving machinery, driving automotive equipment, and exposure to dust, fumes, and gases.  (Tr. 2523-2526.)  The ALJ gave Dr. Landge's opinion "little weight," noting that "the medical evidence as a whole shows that the claimant is not as limited as opined by Dr. Landge."  (Tr. 1271.)  For the same reasons as discussed above regarding the ALJ's assessment of Dr. Khan's opinion, the ALJ did not err in her evaluation of Dr. Landge's opinion.

The ALJ offers a detailed analysis of the medical evidence before evaluating the opinions of Plaintiff's treating physicians, including the opinion of Dr. Landge.  (Tr. 1267-1271.)  The ALJ analyzed the medical evidence and explained how it supported her ultimate RFC determination before indicating that she gave little weight to Dr. Landge's opinion due to its inconsistency with the record as a whole.  (*Id.*)  For example, she discussed the following evidence, which implicitly rejects Dr. Landge's opinion regarding Plaintiff's physical limitations:

- Plaintiff testified that she can lift or carry 15 pounds.  (Tr. 1267.)

- Follow-up notes after Plaintiff's pacemaker surgery indicated that "the claimant continues to do very well with good suppression of her vasovagal syndrome with a regimen of dual chambered pacing in conjunction with Midodrine."  (*Id.*)

- Records from May 2010 noted that Plaintiff's asthma was well controlled with Advair.  (Tr. 1268.)

- In October 2005, Dr. Wohlwend reported that Plaintiff does not have seizures, but rather was having an obvious pseudo-seizure.  (*Id.*)

- Records from June 2011 show that Plaintiff stated she had been feeling very well and has had no problems with any lightheadedness, dizziness, near syncope, or syncope spells of any kind over the past year.  (Tr. 1269-1270.)

- "[D]uring a follow up in October 2011, the claimant reported that she had no

31

spells of any lightheadedness or dizziness, no severe weakness, falls, or injury. She reported no palpation, no shortness of breath, and no chest pain, either at rest or with exertion." (Tr. 1270.)

- In a physical work performance evaluation summary, Dale Arnold, PT, concluded that Plaintiff could carry up to 13 pounds one-handed, push or pull up to 22 pounds, frequently sit, occasionally stand, kneel, bend, squat, climb stairs, walk, and climb ladders. (Tr. 1271.)

Had the ALJ discussed the aforementioned evidence immediately after stating that she was giving little weight to Dr. Landge's opinion, there would be no question that the ALJ provided "good reasons" for giving the opinion less than controlling weight. (Tr. 17.) As was the case with Dr. Kahn, the fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when assessing Dr. Landge's opinion does not necessitate remand of Plaintiff's case. Accordingly, the ALJ did not violate the treating physician rule with regard to Dr. Landge.

### c.  Dr. O'Connor

Finally, Plaintiff argues that the ALJ erred in her evaluation of the opinion of Dr. O'Connor. In February 2009, Dr. O'Connor completed a welfare form on Plaintiff's behalf. (Tr. 2138.) Dr. O'Connor noted on the form that he had not evaluated Plaintiff's standing/walking and lifting/carrying abilities. (Tr. 2139.) He further reported that she had no pushing/pulling, bending, reaching, handling, repetitive foot movement, seeing, hearing, or speaking limitations. (Tr. 2139.) Dr. O'Connor then concluded that Plaintiff was unemployable and unable to work. (*Id.*) The ALJ gave this opinion "little weight," explaining:

> Although the doctor stated that the claimant is "disabled," it is not clear that the doctor was familiar with the definition of "disability" contained in the Social Security Act and regulations. Specifically, it is possible that the doctor was referring solely to an inability to perform the claimant's past work, which

32

> is consistent with the conclusions reached in this decision.  Furthermore, Dr.
> O'Connor asked "what type of work can the claimant do with her restrictions,"
> and a vocational expert testified as to the jobs that the claimant can perform,
> given her residual functional capacity.

(Tr. 1271.)

The ALJ did not err in assigning less than controlling weight to Dr. O'Connor's

February 2009 opinion, as Dr. O'Connor's opinion was not entitled to any special

deference. While Dr. O'Connor opined that Plaintiff was disabled, he provided no

medical basis for his conclusion.  The form Dr. O'Connor completed indicates that he

wrote "not evaluated" next to questions asking whether Plaintiff's condition affected her

ability to stand/walk, sit, and lift/carry.  (Tr. 2139.)  Furthermore, he reported that a

number of Plaintiff's functions – including pushing/pulling, bending, reaching, and

handling – were not affected by her condition.  (*Id.*)  Dr. O'Connor nonetheless

concluded that Plaintiff was permanently disabled and unemployable.  (*Id.*)   The ALJ

adequately justified her decision to give this opinion little weight, explaining her

unwillingness to rely on an opinion of disability from a physician not well-versed in

Social Security regulations.  (Tr. 1271.)  Medical opinions from a treating source, not

statements regarding disability, are entitled to deference.  *See Turner v. Comm'r of Soc.*

*Sec.*, 381 Fed. Appx. 488, 492-493 (6th Cir. 2010) (unpublished) ("Dr. Wright's

statement that Turner was not 'currently capable of a full-time 8-hour workload' was

simply an alternate way of restating his opinion that Turner was 'unable to work.'  It was

thus an opinion on an issue reserved to the Commissioner and was not entitled to any

deference.").  "When a treating physician instead submits an opinion on an issue

reserved to the Commissioner–such as whether the claimant is 'disabled' or 'unable to

33

work'–the opinion is not entitled to any particular weight." *Id.* at 493.  Here, Plaintiff's argument that the ALJ erred by failing to give controlling weight to Dr. O'Connor's opinion is without merit, as Dr. O'Connor's opinion that Plaintiff is disabled is entitled to no special deference.  Accordingly, Plaintiff's argument as to Dr. O'Connor presents no basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*_____
U.S. Magistrate Judge

Date: January 14, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**